IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| JONES LANG LaSALLE AMERICAS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.  1:13-cv-01011 (AJT/JFA) |
| | ) | |
| THE HOFFMAN FAMILY, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Jones Lang LaSalle Americas, Inc. ("JLLA") seeks $6.62 million in commission payments based on the lease of commercial space owned by one of the defendants, located in Alexandria, Virginia, which will become the headquarters for the National Science Foundation ("NSF"). This matter is before the Court on cross motions for summary judgment [Doc. Nos. 34 and 48]. The Court held a hearing on these motions on March 4, 2014, following which it took the motions under advisement. Upon consideration of the parties' cross motions for summary judgment, the memoranda and exhibits filed in support thereof and in opposition thereto, and the arguments of counsel at the hearing held on March 4, 2014, and for the reasons stated herein, the plaintiff's motion will be DENIED and the defendants' motion will be GRANTED.[1]

---

[1] On August 16, 2013, plaintiff filed its Complaint [Doc. No. 1] against defendants, alleging breach of contract and requesting a declaratory judgment.  On November 4, 2013, with leave of Court, the plaintiff filed its Amended Complaint [Doc. No. 26], to which defendants' provided their Answer [Doc. No. 27] on November 8, 2013.  Discovery closed on January 10, 2014 and on January 21, 2014, the parties filed their cross motions for summary judgment.  Following its hearing on March 4, 2014, by Order [Doc. No. 87] dated March 10, 2014, the Court vacated the trial date, then scheduled for March 24, 2014, to be rescheduled, if necessary, following the Court's ruling on the parties' cross motions for summary judgment.

## Facts

The following is undisputed:

In August 2007, the parties signed a Leasing Agreement (the "Agreement"), pursuant to which the defendants, The Hoffman Family, LLC and Hoffman Buildings, L.P.,[2] retained the services of JLLA to act as their "exclusive leasing agent" for certain properties located in Alexandria, Virginia.[3] One of the properties listed in the Agreement, 2401 Eisenhower Avenue, Alexandria, Virginia, is the site of the building to be built and leased to the NSF (the "NSF property") pursuant to a leasing agreement that was executed on June 7, 2013 (the "NSF Lease"). JLLA seeks a commission under the terms of the Agreement based on the NSF Lease.

On April 7, 2011, the General Services Administration ("GSA") solicited Expressions of Interest ("EOI") for the NSF Lease, Solicitation No. 9VA2433. JLLA assisted the defendants in compiling the information necessary to complete a proper response to this EOI solicitation, and on April 27, 2011, on behalf of Hoffman, submitted an EOI to Studley, Inc. ("Studley"), the broker for the GSA. On July 24, 2012, JLLA submitted a second EOI on behalf of Hoffman.

On December 4, 2012, following its solicitation of EOIs, the GSA issued a formal Request for Lease Proposal ("RLP"), and offerors were required to submit their Initial Proposals

---

[2] Unless stated otherwise, there is no need for the Court to distinguish between the defendants, even though they did not always act jointly, as in the signing of the NSF Lease and related documents. Thus, unless otherwise noted, the Court will refer to the defendants both individually and jointly as "Hoffman."

[3] The Agreement was amended in July, 2008, but those amendments are immaterial to the parties' dispute. Other amendments were proposed but never executed. In addition, Hoffman contends that pursuant to an oral agreement reflected in various submissions to the GSA and elsewhere, the parties agreed to a $1 million commission with respect to the NSF lease rather than the 2% commission prescribed under the Agreement. JLLA disputes that it ever agreed to the $1 million commission. Given the Court's disposition of the case, there is no need to consider the legal and factual issues raised by Hoffman's contention.

2

on or before January 9, 2013. On January 9, 2013, JLLA, on behalf of Hoffman, delivered to the GSA (via Studley) a formal lease proposal signed by Hoffman. On March 7, 2013, Hoffman itself sent a Final Proposal Revision, signed by Hoffman, directly to the GSA, through Studley.

After the Final Proposal was submitted, further negotiations took place between Hoffman and Studley directly without JLLA's involvement.[4] On May 23, 2013, Hoffman signed the NSF Lease, as finalized by the GSA and Hoffman.

Shortly after the NSF Lease was signed, the parties' dispute arose over JLLA's commission with respect to the NSF lease. JLLA claimed that, pursuant to the Agreement, it was owed a commission equal to 2% of the NSF Lease's "base rent" of more than $330 million over the 15-year period of the NSF Lease, or a commission in the amount of approximately $6.62 million. Hoffman claimed that the total commission owed to JLLA was $1 million, based on what it claimed were oral agreements that were reflected in the written submissions made to the GSA and elsewhere. The parties were unable to resolve this dispute and JLLA filed this action on August 16, 2013, in which it seeks a commission solely under the terms of the Agreement. During the course of discovery in this action, Hoffman learned for the first time that certain of JLLA's employees involved in the NSF leasing effort were not licensed as real estate salespersons or brokers and now claims that JLLA is not entitled to receive any commission.

Both parties have moved for summary judgment. JLLA claims that, based on the undisputed facts, it is entitled to recover the commission set forth in the Agreement as a matter of law since the Agreement was never terminated and JLLA was the procuring cause of the NSF

---

[4] JLLA represented property owners competing for the NSF Lease other than Hoffman; and because of this disclosed conflict on the part of JLLA, GSA and Studley made the decision to deal with Hoffman directly, rather than through JLLA.

lease. Hoffman seeks summary judgment on JLLA's claim on the grounds that the Agreement, having no "definite termination date" as required under Va. Code Ann. § 54.1-2137B, expired 90 days after its execution, long before any entitlement to any commission arguably arose; and that, in any event, as a matter of public policy JLLA is prohibited from recovering any commission that may be payable under the Agreement since certain of its employees involved in the NSF leasing effort were not licensed as required under Virginia law.

## Standard

Summary judgment should be granted where the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). Entry of summary judgment is appropriate where the moving party demonstrates the lack of a genuine issue of fact for trial, and if that burden is met, the party opposing the motion must "go beyond the pleadings" and come forward with evidence of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S.317, 324 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-248. Indeed, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## Analysis

Because Hoffman's motion, if granted, necessarily eliminates JLLA's legal ability to recover on its claim, the Court will first consider the issues presented in that motion. Those

issues are: (1) whether under Va. Code Ann. § 54.1-2137 the Agreement has a "definite termination date"; (2) whether JLLA's unlicensed employees involved in the NSF leasing efforts were "brokers" or "salespersons" within the meaning of Va. Code Ann. § 54.1-2107, such that they were required to have the requisite licenses pursuant to Va. Code Ann. § 54.1-2106.1; and (3) whether the involvement of any unlicensed JLLA employees in the NSF leasing effort precludes JLLA, which possessed a valid broker's license, from receiving a commission under the Agreement.[5]

### A. Whether the Agreement has a "definite termination date"

Va. Code Ann. § 54.1-2137 states in pertinent part:

A. The brokerage relationships set forth in this article shall commence at the time that a client engages a licensee and shall continue until (i) completion of performance in accordance with the brokerage agreement or (ii) the earlier of (a) any date of expiration agreed upon by the parties as part of the brokerage agreement or in any amendments thereto, (b) any mutually agreed upon termination of the brokerage agreement, (c) a default by any party under the terms of the brokerage agreement, or (d) a termination as set forth in subsection F of § 54.1-2139.[6]

B. Brokerage agreements shall be in writing and shall:

---

[5] Although not raised or briefed by the parties, the Court has considered as an initial matter whether Va. Code Ann. § 54.1-2137(B), imposing the "definite termination requirement," applies to the Agreement or can constitutionally be applied to the Agreement under the Contract Clause of the U.S. Constitution, Article I, Section 10, clause 1. The Agreement was entered into in 2007. Subsection B was passed in 2011 and made effective on July 1, 2012. It does not, by its terms, apply retroactively. Nevertheless, the Court concludes that since the Agreement was renewed after the effective date of Subsection B and before the signing of the NSF Lease, which triggered any obligation for a commission under the Agreement, Subsection B applies to the Agreement and there is no constitutional impediment to its application.

[6] Subsection F of § 54.1-2139 states that "[n]o cause of action shall arise against a dual agent or dual representative for making disclosures of brokerage relationships as provided by this article. A dual agent or dual representative does not terminate any brokerage relationship by the making of any such allowed or required disclosures of dual agency or dual representation."

1.  Have a definite termination date; however, if a brokerage agreement does not specify a definite termination date, the brokerage agreement shall terminate 90 days after the date of the brokerage agreement;

The provisions of the Agreement that bear on whether the Agreement has a "definite termination date" are set forth in Sections 1.1, 2.1, 2.2, and 2.3 of the Agreement.[7]  Those provisions, in effect, cause the Agreement to continue until an uncured default occurs or until one party provides the required notice of termination or the removal of a property from the Agreement.

JLLA contends that the Agreement does not run afoul of Section 54-2137 since it has a "definite termination date," i.e., the date determined through one of the specified termination mechanisms.  Hoffman contends that the Agreement has no "definite termination date" since it is impossible to determine from the face of the Agreement a specific date certain on which the Agreement will, in fact, terminate.  Rather, the termination date necessarily depends on contingencies that cannot be predicted with any precision; and it is possible that the Agreement would never terminate according to its terms.

Whether the Agreement has a "definite termination date" is an issue of Virginia law.  In determining how to construe that requirement, the Court must therefore look to and apply the

---

[7] Section 1.1, titled "**List of Properties**," states that any particular property may be "removed at any time from the scope of this Agreement upon ninety (90) days prior written notice from the Owner and the Property may be expanded upon and added to at any time hereafter upon the mutual written consent of Owner and Leasing Agent." Section 2.1, titled "**Initial Term**", states that "Leasing Agent's duties and responsibility under this Agreement shall begin on the 1st day of January, 2007 and shall end on December 31, 2007, unless sooner terminated as provided herein." Section 2.2, titled "**Renewal Term**", provides that the Agreement "shall automatically be renewed for additional one (1) year terms," unless written notice of termination is provided by either party not less than 60 days before the end of the one year term then in effect. Section 2.3, titled "**Termination**", provides for termination under certain circumstances, including default with notice and an opportunity for cure; sale of any property covered under the Agreement, with 30 days' notice of the sale, but only as to that sold property; or at any point, upon 60 days' notice by either party.

pronouncements of the Supreme Court of Virginia. The Supreme Court of Virginia, however, has not spoken directly to the issue raised in this case, and thus the Court must predict as best it can how that Court would decide the issue. *Ellis v. Grant Thornton LLP*, 530 F.3d 280, 287 (4th Cir. 2008). In making such a determination, the decrees of lower Virginia state courts should be "attributed some weight" and given "proper regard," although their decisions are not controlling and "may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." *See C.I.R. v. Bosch's Estate*, 387 U.S. 456, 465, 87 S. Ct. 1776, 1782, 18 L. Ed. 2d 886; *see also, Private Mortgage Inv. Servs., Inc. v. Hotel & Club Associates, Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). The only lower Virginia state court decision brought to the Court's attention to consider this issue directly is *Piedmont Associates, Inc. of N. Carolina v. Little*, 49 Va. Cir. 488 (1999).

*Piedmont Associates* considered a brokerage contract that terminated upon the sale of five to-be-built homes. There, a Virginia Circuit Court found that "…the Legislature did not intend or mean this statute [Va. Code Ann. § 54.1-2137] to require that every brokerage contract have a date certain (*i.e.*, a month, day and year) on which it terminates, but that a brokerage contract needs to have only a stated date or the occurrence of a specified event from which a fact finder can reasonably determine if contractual obligations have been timely fulfilled." *Id.* Such a contract, the Circuit Court concluded, was "exactly the type of contract that was entered into in this case in which the plaintiff arguably gave consideration for the exclusive right to sell the first five homes, but that no specific time was set down in which the homes would have to be built and then sold." *Id.* As to legislative intent, the Circuit Court found that "the Legislature clearly appears to have contemplated that parties can enter into brokerage contracts which have as their termination point the occurrence of a certain event or events." *Id.*

JLLA points to *Piedmont Associates* as support for its position that in order have a "definite termination date" a brokerage agreement need only have a determinable date of termination through a stated mechanism; and that, like the contract in *Piedmont Associates*, the Agreement has a specified event, i.e., a notice of termination or uncured default date, from which one can determine precisely when the Agreement terminates. Defendants question whether *Piedmont Associates* was correctly decided, but in any event attempt to distinguish *Piedmont Associates* on the grounds that the agreement there, unlike the Agreement here, would terminate on a specific date tied to the occurrence of a specific event, known in advance, such that there was, in effect, a date certain on which the agreement would terminate, whereas here the Agreement would automatically renew each year, with no ability to determine whether it would ever terminate. For the purposes of determining whether the Agreement has a "definite termination date," the Court finds little material difference between the agreement in *Piedmont Associates* and the Agreement here: both fail to specify in the agreement itself the specific date on which the brokerage agreement will end, but rather specify certain events that determine whether the agreement has ended and if so on which precise date.[8] The Court has therefore attributed some weight and given proper regard for the decision in *Piedmont Associates*.

---

[8] Perhaps for these reasons, Hoffman relies more heavily on *Mayo, Hysore & Co. v. Philadelphia Textile Machinery Co.*, 105 Va. 486, 486 (1906), which pre-dated the passage of the Va. Code Ann. § 54-2137(B) by over one hundred years. In that case, the Virginia Supreme Court characterized a construction contract as a contract "of indefinite duration, unless six months' notice of withdrawal was given by one of the parties." Based on this case, Hoffman argues that the Virginia Supreme Court would likely conclude that the Agreement has no definite termination date since, like the construction contract in *Mayo,* the Agreement continues until notice of termination is given. The Court finds little support for Hoffman's position based on *Mayo*. In fact, there is nothing in *Mayo* that suggests that the Virginia Supreme Court would conclude that because a contract is a contract of indefinite duration *unless notice of termination is given*, it is necessarily a contract without a "definite termination date" where the contract specifies the date on which it terminates through notice.

8

The Court concludes that the term "definite termination date" in Subsection B of Va. Code Ann. § 54-2137 refers to a date calculable under one of the mechanisms set forth in Subsection A and that, by that measure, the Agreement has a "definite termination date"—a date that can be calculated through one of the termination mechanisms set forth in the Agreement. In reaching this conclusion, the Court has considered the text and structure of the statute as a whole and the relationship Subsection B appears to have to Subsection A. Viewed in that light, it would appear that Subsection B was added to provide a date of expiration where no specific date of expiration could be determined under the provisions of Subsection A. Accordingly, a "definite termination date" would appear to include, at least, "any date of expiration agreed upon by the parties as part of the brokerage agreement or in any amendments thereto" or "any mutually agreed upon termination of the brokerage agreement." *See* Va. Code Ann. § 54.1-2137(A)(ii)(a) and (b). Here, the Agreement has an expiration date agreed upon by the parties.[9]

---

[9] The Court also finds support for its construction of the statute in the regulations promulgated by the Virginia Real Estate Board, the Virginia administrative agency charged with promulgating regulations consistent with Title 54.1, Chapter 21 of the Virginia Code pertaining to real estate brokers and salespersons. In that regard, 18 Va. Admin. Code § 135-20-290 provides in pertinent part:

> Actions constituting improper dealings include:
>
> > 1. Entering a brokerage relationship that (i) does not specify a definite termination date; (ii) does not provide a mechanism for determining the termination date; or (iii) is not terminable by the client;

*See also* Va. Code Ann. § 54.1-2143 (requiring any regulations adopted by the Virginia Real Estate Board to be consistent with Title 54.1, Chapter 21, Article 1, which includes Section 54.1-2137). Indeed, were Va. Code Ann. § 54-2137 a federal statute and the Virginia Real Estate Board a federal agency, the Court would likely be required to extend *Chevron* deference to its regulations.

For the above reasons, the Court finds and concludes that the Agreement has a "definite termination date" for the purposes of Va. Code Ann. § 54.1-2137(B) and therefore did not expire after 90 days.  As the parties agree that none of the termination provisions in the Agreement was ever exercised, the Agreement was thus in effect at the time of the execution of the NSF Lease and all other material times.

**B. Licensure**

At all material times herein, JLLA held a valid broker's license.  Nevertheless, Hoffman contends that it would be against public policy for JLLA to recover a commission under the Agreement since some of its employees who were involved in the NSF leasing effort and whose activities JLLA relies on for its commission, including specifically Arthur M. Turowski, were unlicensed real estate salespersons.[10]

Virginia law requires that "every employee or independent contractor who acts as a salesperson" for a brokerage firm, such as JLLA, "holds a license as a real estate salesperson or broker[]" and that "[n]o individual shall act as a broker without a real estate broker's license from the Board." Va. Code Ann. § 54.1-2106.1(A)(i) and (B).  Moreover, every employee of a brokerage firm who acts as a salesperson must hold a license as a real estate salesperson in order for a business to obtain a broker's license.[11]  Va. Code Ann. § 54.1-2106.1(A)(ii) and (C). "One act for compensation of ... leasing, or renting, or offering to rent real estate" triggers the

---

[10] Hoffman also contends that JLLA employee Brian T. Saal was required to have a real estate salesperson's license.  Because Turowski was more directly and extensively involved in the NSF leasing effort than Saal, the licensing issues raised by Hoffman can be disposed of without consideration of Saal's need for a license.

[11] "Real estate broker" is defined, in pertinent part, as any person or business entity who for valuable compensation leases or offers to lease, or rents or offers for rent, any real estate or the improvements thereon for others.  Va. Code Ann. § 54-2100.

10

obligation to obtain a real estate broker's or salesperson's license. Va. Code Ann. § 54.1-2107.

"Real estate salesperson" is defined as:

> ...any person, ...who for compensation or valuable consideration is employed either directly or indirectly by ... a real estate broker, to sell or offer to sell, or to buy or offer to buy, or negotiate the purchase, sale or exchange of real estate, or to lease, rent or offer for rent any real estate, or to negotiate leases thereof, or of the improvements thereon." Va. Code Ann. § 54.1-2101.

Following his retirement from the GSA, Turowski joined JLLA in October, 2007, after the Agreement was executed, and held the title of Senior Vice President of JLLA. JLLA does not contest that Turowski was unlicensed or that he was required under his employment agreement with JLLA to obtain a license. Rather, it argues that he did not engage in activities relative to the NSF leasing effort that required a license. This position rests primarily on JLLA's view concerning the scope and nature of the activities that require a license. JLLA argues essentially that a license is required only to make an offer to lease or to negotiate or enter into a lease; and, since it is undisputed in this case that the actual formal offers to rent were made by and in the name of Hoffman, the property owner, and Hoffman, not JLLA or any employee of JLLA, negotiated and executed the actual NSF Lease, Turowski did not require a license to do what he did in connection with the NSF leasing effort. Indeed, it would appear that there was no need for JLLA to be licensed, given its reading of the licensing requirements.

Whether Turowski required a license for his work on the NSF leasing effort must be considered within the context of JLLA's business and the Agreement. There is no dispute that at the time it entered into the Agreement, JLLA was in the real estate brokerage business and that the Agreement was a "leasing agreement" under which JLLA would receive a commission for providing brokerage services as Hoffman's "exclusive leasing agent." Hoffman clearly engaged JLLA for the purpose of locating and procuring tenants for the listed properties, one of which

11

was the site for the NSF Lease. *See* Agreement [Doc. 1-1] at 1, 4, 10.  As the Agreement recites, "the Owner [Hoffman] desires to engage Leasing Agent [JLLA] as its exclusive leasing agent for all existing office space and all planned future office space for or on the Property and in connection therewith to lease and market office space for the Property as the sole and exclusive leasing agent having responsibility therefore, on the terms and conditions hereinafter set forth." *Id.* at Recital B.  Likewise, "Leasing Agent [JLLA] desires to accept such employment to advertise, market, identify, solicit and have executed for the benefit of Owner, Leases for office space at the Property, and is engaged in the business of leasing and marketing office space for properties." *Id.* at Recital C.  JLLA agreed that as Hoffman's "exclusive leasing agent" and "exclusive broker for leasing of space," it "shall at all times have in its employ or contract for sufficient personnel to enable it to lease and market each Property." *Id.* at 4.2.

Under the Agreement, JLLA, in its capacity as Hoffman's exclusive agent, assumed a wide range of duties and responsibilities with respect to locating tenants and procuring leases. More specifically, JLLA agreed to: (1) diligently investigate and develop any offers and inquiries by prospective tenants referred to it by Hoffman or cooperating third party brokers; (2) canvas, solicit, and otherwise employ its best efforts and services to lease space; (3) make every reasonable effort to obtain tenants reasonably satisfactory to the owner; (4) as reasonably possible, procure financial references from prospective tenants, investigate such references and use its best judgment in the selection of prospective tenants; and (5) perform whatever reasonable service may be required in connection with the negotiation of leases for office space at the property. *Id.* at 4.4.  JLLA is also authorized to cooperate with cooperating brokers. *Id.* at 4.7.  With respect to lease forms, JLLA "shall from time to time assist [Hoffman's] counsel as required in [Hoffman's] reasonable opinion, with suggested modifications and/or additions to

12

(including riders) or deletions from said form as are reasonably necessary in [Hoffman's] opinion to conclude the transaction and such suited language must be customary in the market where the applicable Property is located." *Id.* at 4.6.

The Agreement also specified particular duties and responsibilities with respect to JLLA's services directed to procuring government tenants, including specifically the GSA. Those services included: (1) assisting with the development of an overall strategy for positioning the property site/building selection by the government; (2) coordinating the research of competitive properties and competitive market data including the status of each property; (3) identifying the evaluation factors the government might use in identifying a successful lease offeror; (4) assisting in the development of responses to lease award evaluation factors; (5) assisting in negotiation of the lease award and any amendments or modifications to such a lease before government occupancy; (6) monitoring the award process at the government to assure that the award proceeds unimpeded; (7) facilitating communications between Hoffman's team and government specialists, contract officers and brokers; and (8) assisting Hoffman's development team with an understanding and thorough detailed interpretation of any "SFO or RFI" requirement, "award metric," evaluation factor, and/or performance standard. *Id.* at 4.12. Despite the breadth of JLLA's duties, Hoffman specified that all leases shall be in the name of owner and executed by the owner. *Id.* at 4.4.

JLLA assigned Turowski to its team dedicated to discharging its obligations to Hoffman with respect to the NSF property. As part of that assignment, he became centrally involved in many of the leasing activities that the Agreement contemplated JLLA would perform as Hoffman's exclusive leasing agent. He participated in identifying the NSF leasing opportunity, bringing it to Hoffman's attention, and developing the successful strategy that resulted in GSA's

13

decision to competitively bid the NSF lease renewal and Hoffman's successful bid. That strategy included working with Alexandria City officials as well as GSA personnel and GSA's broker, all on behalf of Hoffman, for the purpose of marketing Hoffman's property and soliciting and procuring the NSF lease. Although Turowski joined JLLA after the Agreement was entered into, he later became JLLA's "relationship manager" for Hoffman; and in that capacity, he both signed and delivered to GSA on behalf of Hoffman the EOIs, together with a letter he both wrote and signed, on JLLA letterhead, which identifies him as the owner's agent to whom the government's broker should direct any inquiries. *See* Doc. Nos. 7-1, 48-15. He delivered Hoffman's initial bid on January 9, 2013, and initialed on behalf of the owner every page of the proposed lease form. Turowski also prepared, for the signature of Michael Perine, an Executive Vice President of Hoffman at the time, for delivery to the GSA, the "Authority to Represent Letter" designating Turowski as the contact for Hoffman in the provision of brokerage services. Doc. No. 51-12 at HF00000311. Following the submission of the Final Lease Proposal on January 8, 2013, Turowski continued to pass on communications to Hoffman from the GSA and was involved in the negotiations pertaining to the commission to be paid to GSA's broker, Studley, something that needed to be settled before the leasing transaction could be finalized.[12]

In support of its position that Turowski did not need a license, JLLA relies centrally on the definition of a "real estate salesperson. " *See* Va. Code Ann. § 54.1-2101 ("… 'real estate salesperson' means any person …who…is employed  to lease, rent or offer for rent any real estate, or to negotiate leases thereof…."). Armed with this definition, JLLA points to certain purported admissions by Hoffman for the proposition that Turowski did not do any of the

---

[12] As reflected in e-mails between Turowski, Hoffman and Studley, Turowski was not only advising Hoffman concerning Studley's commission, but also communicating directly with Studley on rates that would become part of the "Aggregate Lease Value."

activities that define a real estate salesperson, including that: (1) Hoffman, not JLLA, signed the document that constituted the initial offer for rent on a GSA Form entitled "Proposal to Lease Space" and also the Final Proposal Revisions making the Offer for Rent; (2) Hoffman, not JLLA, was the "offeror" with respect to the NSF leased space; (3) Hoffman, not JLLA, "submitted" the initial responses and final revised proposal to GSA; and (4) Hoffman, not JLLA, conducted lease negotiations with the GSA and its broker Studley. However, none of these activities by Hoffman insulated Turowski from the need to obtain a real estate salesperson's license.

JLLA's narrow, hyper-formalistic reading of the licensing requirements would effectively eliminate the need for a license by most persons centrally involved in a leasing transaction on behalf of an owner, as Turowski was for Hoffman here. Further, within the context of the statutory scheme pertaining to licensure, the use of the words "lease," "offer" and "negotiate" in the definition of a real estate salesperson are clearly intended to capture the realities and breadth of activities that make up the leasing process, not the specific, more formal events necessary to consummate a transaction. That intent is reflected in the wide-ranging activities that a licensee is statutorily authorized, and obligated, to perform on behalf of an owner/landlord, including, among others: (1) performing in accordance with the terms of a brokerage agreement; (2) conducting marketing activities on behalf of the owner; (3) assisting the landlord in drafting and negotiating leases and letters of intent to lease; (4) presenting written leasing offers to and from the landlord; and (5) providing reasonable assistance to the landlord to finalize the lease agreement. *See* Va. Code Ann. § 54.1-2133(A).

The sparse, pertinent Virginia case law also makes clear that terms such as "negotiate" are to be construed broadly, not narrowly or technically. *See Massie v. Dudley*, 173 Va. 42, 50, 3 S.E.2d 176, 179 (1939) ("…[Massie] contends that since he did not fix the price, nor make the

sale himself, he was not a broker. By some distinction, which we are unable to follow, he further argues that such services as he rendered are not covered by the word 'negotiate.'"). Indeed, the Agreement itself reflects the reality that a leasing agent, without authority to bind an owner, is understood to be "leasing" space. *Compare* Agreement, Section 4.4 ("All Leases shall be in the name of Owner and executed by Owner"); *with* Agreement, Recital C ( "[JLLA] ... is engaged in the business of leasing and marketing offer space for properties') *and* Section 4.2 ("[JLLA] shall at all times have in its employ or contract for sufficient personnel to enable it to lease and market each Property."). The broad range of activities for which a license is required is further highlighted by the statutory description of what limited activities an employee of a broker may engage in without a license. *See* Va. Code Ann. § 54.1-2103(C), which eliminates the need for a real estate salesperson's license for the following limited activities: "(i) exhibiting residential units on such real estate to prospective tenants, if the employee is employed on the premises of such real estate; (ii) providing prospective tenants with factual information about the lease of residential real estate; (iii) accepting applications for lease of such real estate; and (iv) accepting security deposits and rentals for such real estate."

JLLA's position is also irreconcilable with its position that it was the "procuring cause" of the NSF lease, entitling it to a commission. In order to be the "procuring cause" of the NSF Lease, JLLA needed to act to "cause . . . a series of events, which, without break in their continuity, result[ed] in the accomplishment of the prime object of the employment of the broker, which is the procurement of a purchaser ready, willing and able to [lease] the real estate on the owner's terms." *Wilson v. Schmidt & Wilson*, 184 Va. 642, 649 (1945). Here, it is difficult to see how JLLA could be a procuring cause for a lease that entitled it to a leasing commission without a license; and it is equally difficult to conclude that those who were significantly

involved in the activities that made JLLA a "procuring cause," such as Turowski, did not also need a license.

For the above reasons, the Court concludes that Turowski was required to have a real estate salesperson's license for his activities pertaining to the NSF lease and that he failed to be licensed as required.

### 3. Consequences of Utilizing Unlicensed Personnel

Having concluded as a matter of law that Turowski was required to be licensed and that he lacked the required license, the Court also concludes that JLLA is prohibited from receiving any commission it would be entitled to receive under the Agreement, even though at all material times herein it was licensed as a real estate broker.[13] There is no explicit statute or judicial decision that imposes such a prohibition under Virginia law. However, based on public policy declared by the Virginia courts, the Court easily concludes that Turowski's failure to have a license precludes JLLA, as well as Turowski, from receiving any commission with respect to the NSF Lease. Several settled propositions led to this conclusion.

First, Turowski's lack of licensure prohibits him from receiving a commission as a matter of public policy. *See Harrison & Bates, Inc. v. LSR Corp.*, 238 Va. 741, 745 (1989) ("It is well established that, because a contract made in violation of the real estate licensing statutes is illegal, an unlicensed agent cannot recover compensation for his services in negotiating a sale under the contract."); *see also Massie*, 173 Va. at 51 ("The agreement upon which the plaintiffs in error rely is illegal, not merely invalid. It is void as being contrary to a positive statute and to public policy."). Second, JLLA's brokerage license did not cover Turowski or cure Turowski's

---

[13] Although JLLA has not conceded that it is prohibited from recovery if Turowski were required to be licensed, it has not affirmatively asserted in its briefings that Turowski's lack of any required licensure does not preclude its recovery under the Agreement.

failure to obtain a license. *Hancock Co., Inc. v. Stephens, 177,* Va. 349, 352 and 355 (1941) ("...one real estate broker's license cannot license both a corporation and a person" and "[n]o corporation can be granted a broker's license unless every officer and employee of the corporation who actively participates in its real estate business shall hold a license as a real estate broker or salesman."). Third, JLLA, in order to obtain its broker's license, was required to certify that "every employee or independent contractor who acts as a salesperson for such business entity holds a license as a real estate salesperson or broker." Va. Code Ann. § 54.1-2106.1(A). Fourth, at all material times, JLLA had a statutory duty of "reasonable and adequate supervision," which included ensuring that its brokerage services were carried out in accordance with the licensing requirements. *See* Va. Code Ann. § 54.1-2110.1(A) and (B)(3). Those requirements mandated that Turowski hold a license in order to engage in the activities he performed in connection with the NSF leasing effort. Under these circumstances, the Court concludes that Turowski's lack of a real estate salesperson's license precludes JLLA from recovering any commission under the Agreement.[14]

### Conclusion

For the foregoing reasons, the Court finds and concludes that there are no genuine issues of material fact and that defendants are entitled to judgment as a matter of law with respect to plaintiff's claims. Plaintiff's motion for summary judgment will therefore be DENIED; and Defendants' motion for summary judgment will be GRANTED and this action DISMISSED.

An appropriate Order will issue.

---

[14] Because the Court concludes that Hoffman is entitled to summary judgment as to plaintiff's claims, the Court must necessarily also deny plaintiff's motion for summary judgment.

18

_____
/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
April 4, 2014